Filed 7/19/21

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESUS ALBERTO RODRIGUEZ,<br><br>    Defendant and Appellant. | C087974<br><br>(Super. Ct. No. STKCRFECOD20150006748) |

APPEAL from a judgment of the Superior Court of San Joaquin County, William D. Johnson, Judge. Affirmed as modified.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Catherine Tennant Nieto, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts II – IV, VI.

1

Defendant and his codefendant Ralph Gamboa went on a two-day crime spree in Stockton. They robbed and attempted to rob numerous victims, and when met with resistance or perceived noncompliance, they resorted to violence. In separate incidents on the same day, defendant shot Victor D.R. in the head but he survived, Gamboa later shot and killed Luis Z., and defendant later shot and killed Javier R.[1]

A jury found defendant guilty of all 19 counts charged and found true 11 firearm enhancements and two robbery-murder special-circumstances allegations. The trial court sentenced defendant to an aggregate term of 178 years eight months to life plus two consecutive terms of life without the possibility of parole. On appeal, defendant asserts: (1) the evidence was legally insufficient to support the special circumstances finding as to Luis because he was not the actual killer and the evidence was insufficient to prove that he had the intent to kill Luis or was a major participant who acted with reckless indifference to human life; (2) following the enactment of Senate Bill No. 1437, his conviction for Luis's murder must be reversed; (3) as related to Javier R., the evidence was insufficient to prove defendant attempted to rob Javier R. or that it was defendant who shot and killed him and therefore the robbery-murder special circumstances, an attempted robbery conviction, and a firearm enhancement must be struck; (4) Penal Code section 654[2] barred separate punishment for counts 1 (murder of Luis) and count 2 (attempted robbery of Luis), and for count 6 (attempted murder of Victor), count 7 (attempted robbery of Victor), and count 8 (mayhem involving Victor); (5) the trial court's imposition of a $1,000 administrative fee under section 1202.4, subdivision (*l*),

---

[1] Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in Opinions," we refer to the victims and witnesses by their first name and last initial and thereafter by their first names, except where their first name is unusual, in which case we refer to them by their first and last initials.

[2] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

was unauthorized because defendant was sentenced to prison; and (6) the parole revocation fine must be struck because defendant was sentenced to life without the possibility of parole.

We shall modify the judgment to (1) stay execution of the sentence imposed on count 8, mayhem, pursuant to section 654, and (2) impose the $1,000 collection fee pursuant to section 1202.4, subdivision (*l*), the trial court did not orally impose. As so modified, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with multiple counts, two robbery-murder special-circumstance allegations and multiple firearm enhancements related to a two-day crime spree.[3] Codefendants Gamboa and Sirenia Alcauter were charged in the same information. Defendant was 16 years old at the time of these events. After a transfer hearing pursuant to Proposition 57, the "Public Safety and Rehabilitation Act of 2016," defendant was found unfit for juvenile court.

---

[3] Defendant was charged with two counts of first degree murder (§ 187, subd. (a); counts 1, 4), four counts of attempted robbery (§§ 664, 211; counts 2, 5, 7, 9), assault with a firearm (§ 245, subd. (a)(2); count 3), attempted murder (§§ 664, 187, subd. (a); count 6), mayhem (§ 203; count 8), eight counts of second degree robbery (§ 211; counts 10, 11, 12, 13, 14, 15, 16, 17), possession of a firearm near a school (§ 626.9, subd. (b); count 25), and resisting, obstructing, or delaying a peace officer (§ 148; count 26). In connection with count 1, the information alleged felony murder and multiple-murder special circumstances against defendant. (§ 190.2, subds. (a)(3), (17).) In connection with count 4, the information alleged defendant personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), and felony murder and multiple-murder special circumstances (§ 190.2, subds. (a)(3), (17)). In connection with counts 5-8, the information alleged defendant personally discharged a firearm causing great bodily injury. (§ 12022.53, subd. (d).) In connection with counts 9, 10, 11, 15, 16, and 17, the information alleged defendant personally used a firearm. (12022.53, subd. (b).)

### Events Occurring on June 11, 2015

#### Attempted Robbery of C.T.[4]

Just before 3:00 p.m., witness R.G. was at a store on Charter Way in Stockton cashing a check.[5]  When she returned to her car, she saw a robbery taking place.  She saw a man walk towards the far side of California Street and towards a parked car.  He pulled out a gun and pointed it at people inside the car.  R.G. took a picture of the robbery and then called 911.  The 911 call was received at 2:56 p.m.  In the call, R.G. described the person attempting to commit the robbery as a Hispanic male approximately 19 or 20 years old wearing a white shirt and black jeans.

#### Robbery of Mario S.

At approximately 3:00 p.m., Mario S. was parked on California Street where he had driven with his father.  Mario's father went into a salon while Mario stayed in the car.  Mario noticed what appeared to be a son arguing with his father, or a younger guy arguing with an older guy.  The younger person was outside of a car, and the older person was in the car.[6]  Mario resumed texting on his phone.  Then someone came up to the driver's side of Mario's car and told Mario to give him his phone.  The person pulled out a silver revolver, pointed it at the side of Mario's head, and repeated, " 'Give me your phone.' "  He also told Mario, " 'Do you think I'm playing?' "  Mario testified that the person looked "a little younger than I was, and I think probably around 16 years old."  Mario gave the person his phone.  The person opened the rear driver's-side door of Mario's car, grabbed something, and then he took off.  As he was leaving, Mario's father

---

[4]  C.T. did not testify at trial.

[5]  Except where otherwise specified, all events occurred in Stockton.

[6]  The prosecutor argued in closing that this was defendant attempting to rob C.T.

returned and yelled at the person who "dropped the stuff and took off." Mario's father called 911. The call was received at 3:02 p.m.

**Attempted Robbery and Attempted Murder of Victor**

Victor was walking near the corner of Grant Street and First Street, talking to his mother on his cell phone. Victor passed defendant, who was wearing shorts and a white T-shirt. After Victor passed him, defendant said, " 'Hey, let me see that phone.' " Victor turned around and "noticed a revolver probably a foot or two away from [his] face" being held by defendant. The revolver was silver. Victor shook his head and continued to walk. He looked over his shoulder, heard a loud pop, and felt something "really, really terrible," pain on the right side of his head near the corner of his eye. Victor called 911. He described the perpetrator as Hispanic and wearing a white shirt and jean shorts. As of trial, Victor could see color but could not distinguish shapes with his right eye. Victor's 911 call was received at 3:21 p.m.

**Robbery of Javier M.**

At approximately 5:30 p.m., Javier M. drove a friend to Canelo's Market. His friend got out of the car while Javier M. waited in the car. Javier saw defendant in his rearview mirror walk across the parking lot towards where his car was parked. Defendant came to Javier M.'s driver's window and asked to borrow his cell phone. Javier M. refused, saying he had to leave. Defendant then pulled out a gun, pointed it at Javier M., and said, " 'Do you want to die?' " The gun was a silver revolver. Javier M. gave defendant his cell phone. Defendant then demanded money and opened the car door. Defendant took a bag that was in the driver's-side door that Javier M. used for coins. Defendant stepped back, and Javier M. took the opportunity to get out of the car and go into the store.

**Attempted Robbery and Murder of Luis**

At approximately 6:00 p.m., Gilberto V. and Gerardo V. were with their boss, Luis, in the back area of Billy Jack's Tire Shop. Gilberto heard people arguing in

5

Spanish, and so he went to the window. He saw a Hispanic man with a handgun. The man, who was wearing a white shirt, came into the back area and said, " 'Give me money, motherfuckers.' " Gerardo identified Gamboa at trial as the man with the gun.[7] He thought the gun was a gray revolver. Gerardo said he did not have any money. Luis told Gamboa to hold on, reached to his pocket to get money, but, before he could give Gamboa money, Gamboa shot him. Gamboa immediately left and went to the car in which he arrived. He got into the passenger side of the car, and, as soon as he got in, the car drove off.

Luis suffered a close-range fatal gunshot wound. The pathologist testified that the bullet recovered from his body was .356-caliber or nine-millimeter, also consistent with a .38-caliber.

Stockton Police Officer Christopher Pulliam obtained surveillance video from the business across the street from the tire shop. In the video, a male wearing a white shirt can be seen exiting the driver's door of a parked car. A second male can be seen getting out of the passenger side of the car, walking around the car, and getting into the driver's side. The person who got out of the driver's side was off screen for approximately 48 seconds until he ran back to the car and got in the passenger door before the car drove off.

**Robbery of Taco Truck Patrons**

Between 8:00 and 8:30 p.m., Saul R., his brother Jesus R., and Saul's friend Fernando G. were at a taco truck. They were seated at a table in an area behind the taco truck when a car pulled up and Gamboa approached them. Gamboa pointed a gun at them and demanded all the money they had. Defendant participated in the robbery as

---

[7] Gerardo had previously identified Gamboa in a pretrial photo lineup. Gilberto did not identify the man in court, and had previously identified someone in a pretrial photo lineup.

well. He, too, was armed with a gun and he pointed it at Jesus and demanded money. Saul stood up, and Gamboa put the gun to Saul's head and told him to sit back down. Gamboa took $900 from Saul, as well as his wallet with all his papers. Gamboa and defendant also took an iPhone and $100 from Jesus and two phones from Fernando. Defendant and Gamboa walked to a car that was waiting for them and the car drove off.

**Robbery of Martha M.**

Martha M. got out of class between 9:10 and 9:15 p.m. and went to the Sufi Market near the corner of Market and E Street. She got out of her car and was locking her door when defendant approached her and asked her if she had a phone he could use. Martha went to pull her phone out when she felt defendant trying to yank her necklaces off. Martha struggled and held onto her necklaces, and defendant told her to let go. She then saw that defendant had a black gun, which he "basically pointed right at [her] head," and she let go of her necklaces. Defendant yanked her chains and they broke, he took them, and he walked away. He told Martha, " 'You think I'm playing,' " which she took as a threat.

The prosecution played for the jury People's exhibit 114, a surveillance video taken outside of Sufi Market. Martha's car can be seen parking across the street from the market.[8] Martha identified defendant in the video and testified that he was the person who robbed her. Defendant is wearing a white shirt, and dark pants in the recording. He can be seen approaching Martha's car and stopping, partially out of the frame. Seconds

---

[8] Before he interacts with Martha, defendant can be seen standing and walking around the area in front of the store, looking around in all directions. At one point, he walks into the street, approaches a car that stops because defendant is obstructing its way, and interacts with the driver before the car drives off. Immediately before interacting with Martha, a car pulls up in front of the market, the female driver goes into the market, and defendant approaches the driver's side of the car, opens the driver's door causing a passenger to turn towards him, leans in, and rifles through the car handling various objects while the passenger remains seated.

later, he exits the frame altogether. Several seconds later, defendant reappears in the frame, appearing to lean back while pulling on something. It appears that what he is pulling on gives way, and he stumbles backwards a bit, turns around, and walks towards the other side of the frame. At this point, defendant can be seen holding a black gun in his right hand, as Martha testified at trial. Martha testified that, by this point, defendant had taken her necklaces. Defendant walks out the opposite side of the frame. Martha then approaches the market while putting her hand to her neck and looking in the direction defendant went. Based on the time stamp, adjusted for the correct time, defendant's robbery of Martha was completed by 9:22 p.m.[9]

**Corona Liquors**

People's exhibit 197, a city surveillance video recorded near Main and Sonora Streets across the street from Corona Liquors, was played for the jury. The relevant portion of the video was recorded between 9:20 and 9:30 p.m. We shall discuss what appears on the video in greater detail in part III. of the Discussion, *post*. For present purposes, suffice it to say that it can be inferred from the circumstances that this incident and the one we next discuss involving Javier R. appear to be part of a continuous event involving Javier R. We note that Corona Liquors is approximately eight blocks south of Sufi Market and approximately three blocks east from the block of East Sonora Street where Javier R. was shot.

On the video, an individual wearing a white shirt and dark pants gets out of a parked car in the Corona Liquors parking lot and interacts with a second individual who arrived in the parking lot on foot. That person runs away to the west, the other individual gets back in the car, and the car departs westbound in the same direction as the individual who ran.

---

[9] Sergeant Phirun Var testified that the time stamp on the video was an hour off. Thus, these events occurred at approximately 9:20 p.m., not 8:20 p.m..

**Murder of Javier R.**

D.S. lived on East Sonora Street.  At approximately 9:30 p.m., she was in her front yard with her friend, Maria G.  They observed a young man walk by on the other side of the street, walking from right to left.  Maria identified the young man as Javier R., a friend of her children.  They then saw a car drive by slowly in the same direction Javier R. was walking.[10]  The car stopped and a young male wearing a white T-shirt got out of the passenger's side and approached Javier R.  According to Maria, the male who got out of the car was a "kid" whom she estimated to be 16 years old.  That "kid" said something to Javier R., pulled out a black semiautomatic gun, and Javier raised his hands in the air.  D.S. believed she heard something like, " 'I'm going to kill you, I'm going to kill you,' " and Javier R. saying, " 'Don't kill me, don't kill me.' "  Maria just heard Javier R. yell, " 'No.' "  The person with the gun then fired two shots.  Javier R. began walking, holding his chest, and then fell.  The shooter got into the passenger's side of the car and the car drove off.

A.R. also lived on East Sonora Street.  He was going into his house when he heard someone say, in English, " 'I told you I was going to kill you.' "  He turned around and saw someone with a black gun.  A.R. saw another person, later identified as Javier R., raise his hands and turn around, and then the person with the gun shot Javier R. in the back.  A.R. described the shooter as 18 or 20 years old.  A.R., who had gone to the ground, testified the shooter went to a car and he heard the car drove off.  A 911 call reporting the shooting was received at 9:30 p.m.

---

[10] D.S. lived in an even-numbered house on East Sonora Street.  It appears, from People's exhibits 40 and 41, that odd-numbered houses are on the north side of East Sonora Street.  Thus, if D.S. and Maria were at D.S.'s house on the south side of the street facing north, the man would have been walking, and the car would have been driving, east to west.  As previously noted, Corona Liquors was approximately three blocks to the east.

9

Javier R. suffered a fatal gunshot wound to the left side of his lower back and blunt force trauma, which could have resulted from a fall on a hard surface after being shot.

At the scene, an evidence technician found two cartridge casings that both had head stamps that said "WIN," ".40 S and W." The evidence technician also found an expended bullet embedded in the side of a car parked nearby. As we discuss in more detail in the unpublished part of this opinion, the evidence supports the conclusion that defendant was the shooter.

### Events Occurring on June 12, 2015

**Attempted Robbery of Juan O.**

At approximately 6:15 p.m., Juan O. went to the store where he cashed his checks. He parked his minivan in front of the store. When he came out of the store, he went to his vehicle and got in. Defendant approached Juan, opened Juan's passenger door, and asked him if he wanted to buy some weed. Juan said no and started to put his key in the ignition. Juan turned again to look at defendant and saw that he had a gun. The gun was a black semiautomatic. Defendant told Juan to give him all his money. At one point, defendant turned his head and Juan opened his door, fled, and hid by a large trash container. From there, he watched defendant search in his car. Juan held up his cell phone and said that he was going to call the police. Defendant moved around the car and Juan ran off again. There was another car parked nearby with a woman inside, and, as Juan ran, a male came out from behind the car and tried to kick his feet and knock him down. Juan testified he jumped over the person's feet and kept running. At some point, Juan hid again and called the police.

**Robbery of Byron P.-M.**

At approximately 8:00 p.m., Byron P.-R. went to El Paisano Market. He parked his car and, before he could get out, defendant opened the passenger door and placed a gun to Byron's head. Defendant demanded money and threatened to kill Byron.

10

Specifically, he said, " 'Bitch, are you going to give me the money or I'm going to kill you.' " Byron pointed out where his wallet was and told defendant to take the money. Defendant took the money, approximately $140 or $150, shut the door, and walked away. The gun was black and Byron described it as "one of those guns that you pull backwards, that thing . . . and it's on the top."

**Initial Apprehension of Gamboa and Alcauter**

On June 14, 2015, Lodi Police Officer Nick Rafiq attempted to stop a vehicle for a traffic infraction in Lodi. The driver did not pull over and instead sped away, and Rafiq followed. While he was following the vehicle, Rafiq observed a male passenger toss what looked like a handgun out the window. Rafiq continued to follow the vehicle into a parking lot. As soon as the car stopped, Rafiq saw two people get out of the car. The driver, a woman, immediately ran towards Highway 99. Rafiq detained the passenger, Gamboa.

Lodi Police Officer Eric Shaw heard Rafiq's account of the pursuit and that an object had been tossed from the moving vehicle. Responding to the area, he found a stainless steel Ruger revolver. The gun was loaded with five .38-special rounds. Shaw also located Alcauter hiding in a shrub on an embankment on the side of Highway 99.

Both Alcauter and Gamboa were released from custody that day.

**Apprehension of Gamboa and Defendant**

On June 20, 2015, Stockton Police Officer Richard Zamora saw defendant and Gamboa walking together. Zamora got out of his patrol vehicle and yelled at them to stop. Gamboa stopped where he was but defendant, who had a backpack, ran away. Zamora stayed with Gamboa. Officer Sean Rogers pursued defendant. While defendant was running, he dropped the backpack between a school and a church. Rogers recovered the backpack. Inside, he found a Glock Model 22 semiautomatic. There was one round inside the backpack and 10 in the gun's magazine. On the slide of the handgun were the

11

numbers .40, indicating that it was a .40-caliber firearm.  The rounds bore the head stamp "WIN .40 S and W."

### Further Investigation and Forensic Firearms Examination Testimony

Detective Lisa Asklof participated in a search of a residence associated with Gamboa.  During the search, police found three cell phones, one of which was Mario's phone.

Rocky Edwards, an expert in firearm and tool mark identification, test fired the Ruger .38-special handgun and concluded that the bullet recovered from the body of Luis was fired from the Ruger.  Edwards also examined the Glock Model 22 and ammunition marked ".40 SW."  He testified that ".40 SW" referred to the caliber of firearm, that they were ".40 Smith and Wesson, which is basically a ten-millimeter short."  Edwards examined the two cartridge casings recovered from the scene where Javier R. was killed.  He concluded that the Glock 22 was the gun that fired those cartridge casings.

### Sirenia Alcauter's Testimony

Sirenia Alcauter testified for the prosecution under a plea agreement.[11]  Alcauter testified that she had been romantically involved with Gamboa for approximately five or six months before she was arrested.  She knew defendant as Gamboa's friend.

On June 11, 2015, Alcauter received a text message from Gamboa which read, " 'load the tray,' t-r-a-y, '8.' "  She understood this message to mean that she was to load Gamboa's .38-caliber revolver, and she did so.  Alcauter testified that a photograph of the stainless steel revolver Officer Shaw found after it had been thrown out of the car was the gun she loaded for Gamboa on June 11, 2015.  Gamboa had possessed that gun for as long as Alcauter had known him.  Gamboa came to Alcauter's house on June 11, 2015,

---

[11]  Pursuant to the plea agreement, in exchange for her testimony, she pled guilty to the voluntary manslaughter of Luis and the robberies of Mario, Javier M., Saul, and Jesus, for which she would be sentenced to an aggregate term of 15 years in prison.

and she gave him the loaded .38. Gamboa also owned another gun, the black Glock Model 22 Alcauter also identified in a photograph.

Alcauter testified that, on June 12, 2015, she rode in her car with Gamboa, who was driving, and defendant. They went to a location in the area of California Street and Martin Luther King Boulevard. Defendant got out of the car, and Gamboa stayed in the car with her. At some point, Gamboa got out of the car, went around to the back of the car, and "tripped the man that was running along the side of the sidewalk." Then defendant returned to the car.

They then drove to the El Paisano Market. Alcauter went into the store and, when she came out, she walked towards her car. As she did so, she saw defendant standing at the front passenger door of the car behind hers. Alcauter got into her car, and shortly thereafter, defendant got into her car. When they drove away, the car defendant had been standing by was following them. Defendant said he wanted to open the door and shoot in the air to scare the other car off, but Alcauter told him not to.

On June 14, 2015, Alcauter was driving her car in Lodi and Gamboa was with her. She noticed a Lodi police car behind her trying to pull her over, but at Gamboa's direction, she kept going. Gamboa had one of his guns with him, and he said it was hot, which Alcauter understood to mean that it had been used in a crime. He said he was going to throw the gun out the window, and Alcauter saw him do so. At some point, Alcauter came to a stop in a parking lot, and she got out of the car and ran across the freeway to the other side of the freeway. She ran into a bush where she hid, but was ultimately found and arrested. Both Alcauter and Gamboa were released on the same day.

Alcauter and Gamboa spent that night together. At some point, Gamboa mentioned that he was "waiting for the police to knock down his door." Later, he told Alcauter that he had shot someone with the gun that he had thrown out the car window.

13

Referring to the person he shot, Gamboa told Alcauter that "he didn't want to give it up so [Gamboa] shot him."

## Verdicts and Sentence

The jury found defendant guilty on all counts and found the special circumstances and firearm enhancement allegations true.  The trial court sentenced defendant to an aggregate term of 178 years eight months to life plus two consecutive terms of life without the possibility of parole.

## DISCUSSION

### I.  Sufficiency of the Evidence -- Felony Murder Special Circumstance Regarding the Murder of Luis Z.

### A.  Defendant's Contentions

Acknowledging he was sitting outside the tire shop in the car, defendant emphasizes it was Gamboa who went inside and shot Luis in the course of an attempted robbery.  Defendant argues the evidence was insufficient to prove either that he had the specific intent to kill Luis or that he was a major participant who acted with reckless indifference to human life.  Comparing the facts of this case to the facts in *Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140] (*Enmund*), *Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127] (*Tison*), and *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), and considering those facts along the *Enmund-Tison* continuum, defendant asserts that, like the defendants in *Enmund* and *Banks*, he was a mere getaway driver.  Thus, according to defendant, he was not a major participant.  Additionally, focusing on the factors set forth in *People v. Clark* (2016) 63 Cal.4th 522, 618-623 (*Clark*), defendant asserts that the evidence was insufficient to demonstrate that he acted with reckless indifference to human life.

We are aware of no published cases applying the *Banks*/*Clark* analysis to a murder committed during the course of a crime spree.  In our view, the circumstance of a crime spree adds a dimension to the analysis not present in the typical single-event scenario.

14

Given the crime spree here and defendant's role in it, we conclude there is substantial evidence supporting the special circumstance finding as to the murder of Luis.

## B. Standard of Review

"The law governing sufficiency-of-the-evidence challenges is well established and applies both to convictions and special circumstance findings. [Citations.] In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).) In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added.)

## C. *Tison* Liability

The felony-murder special circumstance applies to aiders and abettors who either act with intent to kill (§ 190.2, subd. (c)), or who are major participants and act with reckless indifference to human life (§ 190.2, subd. (d)). The "reckless indifference" and "major participant" elements of section 190.2, subdivision (d), codify the holding in *Tison, supra,* 481 U.S. 137. (*Banks*, *supra*, 61 Cal.4th at p. 794.) As a shorthand, we

15

shall refer to the major participant/reckless indifference theory for special circumstances aider and abettor liability as *Tison* liability.

Major participation is the actus reus requirement for felony-murder special circumstances and reckless indifference is the mens rea requirement. (*Banks, supra*, 61 Cal.4th at p. 798.) These elements "often overlap." Major participation, while not sufficient to establish reckless indifference by itself, can "often provide significant support for such a finding." (*Tison, supra*, 481 U.S. at p. 158, fn. 12; accord, *Clark, supra*, 63 Cal.4th at pp. 614-615 [noting the "interrelationship" between the two elements and that they often overlap]; *People v. Medina* (2016) 245 Cal.App.4th 778, 788 [noting, "[t]hese two requirements -- having a reckless disregard for human life and being a major participant -- will often overlap."].) In evaluating evidence of *Tison* liability, "it is important to consider where the defendant's conduct falls on the 'spectrum of culpability' that *Enmund* and *Tison* established." (*In re Scoggins* (2020) 9 Cal.5th 667, 675 (*Scoggins*).)

Earl Enmund was the getaway driver in a robbery murder. (*Enmund, supra*, 458 U.S. at pp. 784-787 & fn. 2.) He drove two armed confederates to the victims' house "and waited nearby while they entered. When [the] wife appeared with a gun, the confederates shot and killed both [the husband and wife]. Enmund thereafter drove his confederates away from the scene and helped dispose of the murder weapons, which were never found." (*Banks, supra*, 61 Cal.4th at p. 799.) There was evidence Enmund had planned the robbery (*Enmund*, at p. 803 & fn. 5 (dis. opn. of O'Connor, J.)), but there was no evidence he was present when the killing occurred or that he participated in a plan to murder (*id*. at pp. 786, 795). The high court stated that "the record before us does not warrant a finding that Enmund had any intention of participating in or facilitating a murder." (*Id*. at p. 798.)

Closer to the other end of the continuum are the Tisons. They "helped plan and carry out the escape of two convicted murderers from prison—one of whom, Gary Tison,

16

was serving a life sentence for killing a guard in the course of a previous escape. [Citation.] This entailed their bringing a cache of weapons to prison, arming both murderers, and holding at gunpoint guards and visitors alike." (*Banks, supra*, 61 Cal.4th at p. 802.) As part of the escape, the Tisons "later participated in stopping and capturing an 'innocent family whose fate was then entrusted to the known killers [the Tisons] had previously armed.' [Citation.] They robbed the family and held them at gunpoint while the two murderers deliberated whether the family should live or die, then stood by while all four members were shot.' [Citation.] . . . [¶] The Tisons did not assist in a garden-variety armed robbery, where death might be possible but not probable, but were substantially involved in a course of conduct that could be found to entail a likelihood of death; distinguishing *Enmund*, the Supreme Court said: 'Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each petitioner was actively involved in every element of the kidnaping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight.' [Citation.] Unlike the Tisons, Earl Enmund *was* just a getaway driver, sitting in a car away from the murders." (*Id*. at pp. 802-803.)

As our high court has noted, the defendants' conduct in *Enmund* and *Tison* "help define the constitutional limits for punishing accomplices to felony murder. [Citation.] The defendants' conduct in those cases represent points on a continuum, a spectrum of culpability for felony-murder participants. [Citation.] At one end of this *Enmund-Tison* continuum is ' "the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state." [Citation.]' [Citation.] At the other end are the 'actual killers and those who attempted or intended to kill. [Citation.]' [Citation.] 'Somewhere between them, at conduct less egregious than the Tisons' but more culpable than . . . Enmund's, lies the constitutional minimum' showing required for the imposition of death or life without the possibility of parole." (*In*

17

*re Loza* (2017) 10 Cal.App.5th 38, 46 (*Loza*), quoting *Banks, supra,* 61 Cal.4th at pp. 800, 802.)

### D. Analysis

Defendant would have us evaluate the sufficiency of the evidence here by looking at the attempted robbery and murder of Luis in isolation, completely detached from the violent crime spree in which he participated. Instead, we consider the totality of the circumstances in evaluating a defendant's placement along the *Enmund-Tison* continuum. (*Banks, supra*, 61 Cal.4th at p. 802; *In re Miller* (2017) 14 Cal.App.5th 960, 974; *Loza, supra*, 10 Cal.App.5th at pp. 48-49.) The totality of the circumstances here does not merely consist of defendant sitting in a car waiting to drive Gamboa away from the tire shop after Gamboa attempted to rob, and then murdered, Luis. The totality of the circumstances here includes the facts surrounding the two confederates' crime spree, in particular the events leading up to the murder of Luis, as well as the events that took place thereafter.

### 1. Major Participant

To be a major participant, "a defendant's personal involvement must be substantial, greater than the actions of *an ordinary aider and abettor* to an *ordinary felony murder* such as Earl Enmund." (*Banks, supra*, 61 Cal.4th at p. 802, italics added.) "The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major." ' " (*Clark, supra*, 63 Cal.4th at p. 611.) To assist in determining whether an aider and abettor is a major participant, the *Banks* court identified "factors that distinguish the Tisons from Enmund." (*Banks*, at p. 803.) The non-exclusive list of factors includes: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or

conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?  *No one of these considerations is necessary*, nor is any one of them necessarily sufficient.  All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' "  (*Ibid*., fn. omitted, italics added.)

We reject defendant's contention that he "merely sat in a car outside the business where the shooting occurred and acted as the getaway driver," and that he was "just the getaway driver."  Contrary to defendant's framing, we must consider the "totality of the circumstances."  (*Banks, supra*, 61 Cal.4th at p. 802; *Loza, supra*, 10 Cal.App.5th at pp. 48-49.)  Looking at the totality of the circumstances requires that we not look at this single event in isolation.  And looking at the totality of the circumstances here reveals defendant was no "*ordinary aider and abettor to an ordinary felony murder* such as Earl Enmund."  (*Banks*, at p. 802, italics added,)

Less than three hours before Gamboa murdered Luis during the attempted robbery at the tire shop, defendant attempted to rob Victor at gunpoint, and, when defendant faced resistance, he shot Victor in the head.

Defendant's attempted murder and attempted robbery of Victor followed very shortly after the attempted robbery of C.T. and the robbery of Mario, within minutes of each other.  As to Mario, the jury found that defendant personally used a firearm in the commission of the robbery.

And less than one hour before the murder at the tire shop, defendant robbed Javier M. at gunpoint. When Javier M. resisted, defendant pulled out a gun, pointed it at Javier M., and said, " 'Do you want to die,' " obviously not an idle threat given that defendant had shot Victor in the head less than three hours earlier.

19

Within three hours of all this activity, Gamboa drove up to Billy Jack's Tire Shop with defendant in the passenger seat. Gamboa went inside. Defendant got out of the passenger seat of the car, got into the driver's seat, and prepared to make a getaway, which he did when Gamboa came out. All of this activity places defendant in a far different league than Earl Edmund. He was not just a getaway driver in a single episode. He was a major participant in an obvious conspiracy to commit a series of robberies. And while the evidence establishes that defendant was the gunman for most of these robberies, as for the attempted robbery and shooting of Luis, it simply appears that Gamboa took a turn at being the gunman/shooter.

Regarding the *Banks* major participant factors, although the evidence did not establish what role defendant played in "planning the criminal enterprise" here that led to Luis's murder, that crime was obviously part of an ongoing conspiracy to commit armed robberies involving defendant and Gamboa, and the evidence establishes that defendant was a major participant in carrying out that plan. And although defendant did not supply the weapons, he did play a role in "using lethal weapons." (*Banks, supra*, 61 Cal.4th at p. 803.) Indeed, from the evidence indicating defendant and Gamboa had two guns—a silver revolver and a black semiautomatic—it can be reasonably inferred that the silver revolver defendant used to rob Mario and Javier M. and shoot Victor was the same one Gamboa later used to shoot Luis. Thus, although defendant did not supply the gun, the evidence indicates he relinquished control of it to Gamboa. Moreover, it can be inferred from the evidence indicating defendant later used the black semiautomatic firearm, that he himself was armed with that weapon while sitting in the car outside the tire shop. As to an awareness of the "particular dangers posed by the nature of the crime" (*Banks, supra*, 61 Cal.4th at p. 802), the evidence establishing the totality of the circumstances leading up to the murder of Luis supports a finding that defendant was clearly aware.

Moreover, in determining major participation our high court instructed that consideration must be given to what the defendant did after lethal force was used.

20

(*Banks, supra*, 61 Cal.4th at p. 802.) Here, not only did defendant drive Gamboa away, but unfazed by any of the afternoon's events, he and Gamboa continued their crime spree after Luis was murdered. Approximately two hours later, together they robbed Saul, Jesus, and Fernando at the taco truck, both defendants brandishing guns during that episode. Approximately one hour later, defendant robbed Martha of her necklaces at gunpoint, yanking the chains off of Martha by force and saying, " 'You think I'm playing.' " Less than four hours after Gamboa murdered Luis, the evidence establishes that defendant murdered Javier by shooting him in the back as Javier held his hands up in surrender and begged defendant not to kill him. And, without elaborating further, defendant and Gamboa continued their crime spree the next day. From the evidence of defendant's major participation after lethal force was used by Gamboa to kill Luis, we can infer that he was a major participant in the crimes committed against Luis.

Thus, contrary to defendant's perspective, in our view, defendant's conduct during the crime spree with Gamboa is relevant when considering the totality of the circumstances. The evidence related to the crimes committed before and after Luis was killed establishes defendant's and Gamboa's plans to engage in the robberies together, both as major participants. In addition, their conduct demonstrates their shared intent as to how to handle perceived resistance.

As our high court noted, no one of the factors it listed in *Banks* is necessary; nor is the list exclusive. (*Banks, supra*, 61 Cal.4th at p. 802.) "The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major." ' " (*Clark, supra*, 63 Cal.4th at p. 611.) Based on consideration of the totality of the circumstances, we conclude that defendant was indeed a major participant in the attempted robbery and murder of Luis.

21

## 2. Reckless Indifference to Human Life

Our high court has adopted the Model Penal Code definition of reckless indifference, which requires that the defendant "consciously disregard[] a substantial and unjustifiable risk" of death and that the risk "be of such a nature and degree that, *considering the nature and purpose of the actor's conduct and the circumstances known to him* [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." (*Clark, supra*, 63 Cal.4th at pp. 617, 622. italics added.) This definition recognizes that, in addition to the subjective element of reckless indifference, there is also an objective element. (*Ibid*.) "[R]ecklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.' " (*Id*. at p. 617.)

Acknowledging overlap between the major participant and reckless indifference elements (*Clark, supra*, 63 Cal.4th at pp. 614-615), our high court considered a number of factors in determining whether the evidence is sufficient to establish reckless indifference: (1) knowledge of weapons, and use and number of weapons; (2) physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) duration of the felony; (4) defendant's knowledge of cohort's likelihood of killing; and (5) defendant's efforts to minimize the risks of the violence during the felony. (*Id*. at pp. 618-623.) As with the major participant factors, " '[*n*]*o one of these considerations is necessary*, nor is any one of them necessarily sufficient.' " (*Id*. at p. 618, italics added.)

We conclude the evidence here supported a finding of reckless indifference. We first note that this case is different from *Clark*, where there was only one gun at the scene and it was not supposed to be loaded (*Clark, supra,* 63 Cal.4th at pp. 621-622), and from *Scoggins*, where none of the perpetrators were supposed to be armed (*Scoggins, supra,* 9 Cal.5th at pp. 671, 679, 682, 683). Here, the evidence established that both defendant

and Gamboa were armed with guns and defendant knew Gamboa had a firearm when he went into the tire shop. While not sufficient of itself in determining reckless indifference, the aider and abettor's awareness that a firearm will be used in the commission of the underlying felony is nevertheless significant. (*Clark*, at p. 618.) Further, as the court in *Clark* noted, "[a] defendant's knowledge of factors bearing on a cohort's likelihood of killing are significant to the analysis of reckless indifference to human life." (*Id*. at p. 621.) Here, although there is no direct evidence that defendant knew Gamboa had a propensity to kill, given that defendant himself had just shot someone in the head in this ongoing conspiracy with Gamboa to commit robberies, it can be reasonably inferred that defendant knew his older confederate would be willing to resort to the same levels of violence, especially if met with perceived resistance. Additionally, the trial record makes clear defendant did not try to "restrain the crime" or minimize the risks of violence in the commission of the attempted robbery; nor is there even any evidence that defendant would have been inclined to do so. To the contrary, his conduct before and after Luis was killed showed defendant was all in for the violence. Indeed, his conduct involving similar crimes establishes subjective reckless indifference to human life in much the same way as other crimes evidence can establish intent or knowledge under Evidence Code section 1101, subdivision (b). (See *People v. Lindberg* (2008) 45 Cal.4th 1, 24-25 ["Under the totality of the circumstances," evidence of uncharged robberies admissible to prove intent for charged attempted robbery]; *People v. Hendrix* (2013) 214 Cal.App.4th 216, 242 [requisite knowledge can be inferred from experience gained in prior similar events; people learn from their experiences and knowledge gained from such experiences can be retained and recalled in the future].)

With regard to the objective component of reckless indifference, the *Clark* court noted: "under the Model Penal Code definition, although the presence of some degree of defendant's subjective awareness of taking a risk is required, *it is the jury's objective determination that ultimately determines recklessness*. . . . [A] defendant's good faith but

23

unreasonable belief that he or she was not posing a risk to human life in pursuing the felony does not suffice to foreclose a determination of reckless indifference to human life under *Tison*." (*Clark, supra*, 63 Cal.4th at p. 622, italics added.) Here, defendant does not assert that he had a good faith belief there would be no lethal violence and there is no evidence from which a jury could objectively find he did. Substantial evidence supports the jury's objective determination that defendant acted with reckless indifference to human life during the course of the crime spree leading up to and during the attempted robbery and murder of Luis, and indeed, he continued to do so thereafter.

### 3. Major Participant/Reckless Indifference to Human Life Conclusion

In considering whether there is substantial evidence of *Tison* liability, reviewing courts must not become so focused on the *Banks*/*Clark* factors that they lose sight of the substantial evidence standard of review. We review the entire record in the light most favorable to the judgment. (*Clark*, *supra*, 63 Cal.4th at p. 611; *Banks*, *supra*, 61 Cal.4th at p. 804; *Jennings*, *supra*, 50 Cal.4th at pp. 638-639.) In doing so, we ignore competing inferences that could lead to a contrary conclusion. "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Jennings*, at pp. 638-639.) As we have noted, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*Penunuri, supra,* 5 Cal.5th at p. 142.) Given the totality of the circumstances here, substantial evidence supports the conclusion that defendant was a major participant who acted with reckless disregard for human life when Gamboa killed Luis.

### II. Senate Bill No. 1437

Defendant asserts that, for the same reasons he advanced in part I. of the Discussion, *ante*, the evidence is insufficient to support his conviction of the murder of Luis because the crime of felony murder has been redefined by Senate Bill No. 1437

24

(2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) (Senate Bill 1437).[12] He also asserts that Senate Bill 1437 should be given retroactive application under the rule in *In re Estrada* (1965) 63 Cal.2d 740.

While this case was pending on appeal, our high court decided *People v. Gentile* (2020) 10 Cal.5th 830 (*Gentile*), which addressed the question of retroactive application of Senate Bill 1437. There, our high court held: "the procedure set forth in section 1170.95 is the exclusive mechanism for retroactive relief and thus the ameliorative provisions of Senate Bill 1437 do not apply to nonfinal judgments on direct appeal." (*Gentile,* at p. 839.) Accordingly, defendant must file a section 1170.95 petition in the trial court if he wants to seek relief under Senate Bill 1437.

### III.  Substantial Evidence - Attempted Robbery and Murder of Javier R.

### A.  Additional Background

In closing arguments, the prosecutor elaborated on his theory concerning the killing of Javier R. It was the prosecutor's theory that defendant initially attempted to rob Javier R. in the parking lot of Corona Liquors. He asserted that, when Javier R. "didn't give it up fast enough, they followed him, and [defendant] got out of the car and told him he would kill him, and then he shot him in the back as Javier [R.] stood there with his hands raised surrendering." The prosecutor argued to the jury: "Did the suspect attempt to rob Javier [R.]? We're going to get really deep into this later when we talk about ID. But all this pattern, the video from the first one is around 3:00 . . . , the video from Sufi Market with Martha . . . and the video from Sonora and Main at that Corona Liquors store which we're going to watch. And this proximity to . . . East Sonora. And the threats to kill the other robbery victims. 'Do you think I'm playing? Do you want me to kill you?' You know that they tried to rob Javier [R.] and then they killed him."

---

[12]  Given our high court's holding in *Gentile*, we need not grant defendant's request that we take judicial notice of certain legislative history of Senate Bill 1437.

The prosecutor further argued: "The time line. Martha . . . was robbed by [defendant] at Sufi Market at approximately 9:22 p.m., and then you have video of Main and Sonora that shows the car leave [Corona] liquor store lot at 9:28:13." He argued that where Javier R. was killed was "two blocks away maybe." Describing what can be seen on the surveillance video, People's exhibit 197, he continued: "You see this car cross Main Street, pull in. You see on the map it's a little parking lot, that taco place. Turn around, come out, stop in the lane of traffic, and then go around and into the parking lot, stopping by a market, trolling for victims. It's an unusual amount of time to stop in a lane of traffic there. [¶] This isn't the clearest video, but you can see the general type of car, the general color, and you can see that car back into that spot. Look at that. Pretty consistent with that car from the Sufi Market video, the one that [Alcauter] said was my car. [¶] Watch the passenger get out with a white shirt approach the van here, and there's going to be someone on foot here. Instead, the van goes around, so there's no one in the van. The driver of the van wasn't there. You can watch the video. He's going to approach that person on foot. Watch the exchange. Look at the body position of that person in the white shirt who had got out of the car. [¶] Watch these two. Standing with some separation, I would submit to you that the person in the white shirt had arms outstretched. Then the other person who ran off in this direction towards East Sonora Street goes back to the van. That person in the white shirt and the person in the car starts to pull away. Look at that car. Hops in the car and goes out the back parking lot and takes a right onto Marsh Street. At 9:28:13 they're off camera. [¶] . . . [¶] Just to remind you, 9:28:13 out here and to the right, the first 911 call recording the shots fired that killed Javier . . . was at 9:30. You heard that. You heard that call. You saw that transcript. [¶] How long does it take to go two blocks, get out of the car, tell Javier [R.] , 'I told you I was going to kill you,' and then shoot him? I submit to you, the person you saw run away from Corona Liquors is Javier R. That's why they killed him."

26

During the investigation, D.S., who had witnessed the shooting of Javier R., identified Gamboa in a photo lineup as the shooter. She told officers that she had seen someone on the news whom she recognized as the shooter and it was the older of the suspects in the news story. D.S. also identified Gamboa at trial as the person she earlier identified in a photo lineup.

However, Maria told police that it was the younger of the suspects she saw on television that did the shooting. Maria testified that, on the news program, she saw images of defendant, Gamboa, and a female.

The prosecutor argued that D.S.'s identification of Gamboa as the shooter was mistaken and not credible. He emphasized that D.S. picked Gamboa from a lineup after seeing a news broadcast.

## B. Defendant's Contentions

Defendant asserts that the robbery-murder special circumstance, attempted robbery conviction, and personal discharge of a firearm causing death enhancement as to Javier R. must be struck, because the evidence was insufficient to prove that he attempted to rob Javier R., or that he was the shooter. Defendant asserts that no witness testified that they observed an attempt to rob Javier R. Defendant further asserts that the prosecutor's contentions in his closing argument were speculation because no one identified the person running away from Corona Liquors as Javier R. With regard to the firearm enhancement, defendant emphasizes that D.S. identified Gamboa as the shooter. He thus asserts the evidence was insufficient to prove that he was the person who shot Javier R. Defendant concedes the evidence is sufficient to support his murder conviction "since there was sufficient evidence he aided and abetted the shooting," but asserts that, in the absence of sufficient proof of the identity of the shooter, the firearm enhancement must be struck.

27

## C. Analysis

Defendant effectively concedes that either he or Gamboa killed Javier. However, he maintains that it cannot be established whether he or Gamboa was the actual shooter, and the evidence does not establish an attempted robbery. We disagree. The circumstantial evidence establishes that defendant and Gamboa were engaged in multiple robberies and that Javier R. was another one of their victims. Moreover, the firearms evidence and Maria's testimony provide sufficient evidence supporting the conclusion that defendant was the shooter.

Martha was robbed by defendant at the Sufi Market less than 10 minutes before Javier R. was shot and killed. Defendant was wearing a white shirt and used a black gun. D.S., Maria, and A.R. all testified that the gun used by the person who shot Javier was black. The prosecution's firearms and tool mark expert testified that the two cartridge casings recovered from the scene were fired from a black Glock Model 22. The loaded black Glock Model 22 had been recovered by police from a backpack that defendant dropped when police were pursuing him nine days after Javier R. was murdered.

Additionally, Maria testified that it was a "kid" who got out of the car and shot Javier R. She estimated the "kid" to be 16 years old. Defendant was 16 years old when Javier was killed. It is undisputed that defendant was several years younger than Gamboa.

People's exhibit 197, the city surveillance video recorded near Main and Sonora Streets, shows a vehicle comes into the frame across Main Street from the Corona Liquor store.[13] The vehicle crosses the four lanes of traffic and then pauses for approximately 15 seconds situated perpendicular in the right lane of traffic on Main Street. It then preceded onto the street to the side of the store. After the car passes out of view,

---

[13] The video quality is poor. We have carefully reviewed it multiple times to ascertain the movements we describe herein.

28

obstructed by the liquor store, it reappears behind the store, turning right and into the store's parking lot. The car pulls to the front of the parking lot, and then reverses into a parking space adjacent to the store. An individual wearing a white shirt and dark pants immediately exits the front passenger side of the car (the passenger), walks around the back of the car toward a parked van, and looks into the van on the driver's side and then the passenger's side. As the passenger proceeds from the driver's side of the van to the passenger side, an individual wearing a darker shirt enters the rear of the parking lot on foot walking toward Main Street. As he approaches the rear of the van, he appears to suddenly dart several steps to his left, away from the van and where the passenger was located. Immediately, the passenger emerges from where he had been at the passenger side of the van, approaching the other individual. The two individuals approach and face one another. The passenger then abruptly takes a step forward, closing the distance between the two, and appears to have an arm raised, perpendicular to his body, pointed at the other individual. The passenger appears to bend his knees or crouch down a bit and he backs up a step or two with an arm still pointed at the other individual. At that time, another individual approaches the white van and opens the driver's door. As he does so, the driver of the vehicle from which the passenger had emerged, who also appears to be wearing a white shirt (the driver), gets out of the car and approaches the person who opened the driver's door of the van as that person gets into the van. The driver appears to have his arm raised and pointed at the person getting into the van. Meanwhile, the passenger and the individual with the darker shirt remain in place facing each other, the passenger appearing to rock a bit. The driver makes several abrupt movements at the driver's door of the van, and, after one such movement, the passenger takes two very quick steps back towards the van. At this time, the passenger and the individual with the dark shirt appear to begin to circle each other, moving back and forth. It appears that the passenger's attention is suddenly directed elsewhere briefly, seemingly at the action happening at the driver's door of the van, and at that moment, the individual with the

darker shirt runs away and out of the parking lot. The passenger appears to pursue him to the edge of the parking lot as the driver leaves the driver's door of the van and returns to the car. The passenger then runs back toward the van, stops at the rear of the van, goes to the now-closed driver's door of the van briefly, and then runs to the car as the driver begins to drive the car away. The passenger enters the car through the driver's-side rear door, and the car drives off in the same direction as the individual with the dark shirt fled.

During deliberations, the jury asked to view People's exhibit 197 twice, on consecutive days. On the second occasion, the jury asked: " 'May we please review the video of Corona Market again and be able to pause and rewind it at certain points?' " The court had the video played, and it was paused and replayed as directed by the jury foreperson.

Detective Asklof identified the location of the Sufi Market, where Martha was robbed earlier, and Corona Liquors, on People's exhibit 40, an aerial map of the area, and People's exhibit 41, a closeup of that aerial map. Asklof also testified that Corona Liquors appeared on the map near East Sonora Street. The prosecutor in closing noted that exhibit 41 "shows you the relationship between Sufi Market, Corona Liquors and East Sonora Street." Sufi Market, where Martha was robbed at roughly 9:22 p.m., is approximately eight blocks north of Corona Liquors. The location on East Sonora Street where Javier R. was shot at approximately 9:30 p.m., appears to be roughly three blocks to the west of Corona Liquors. When he was shot on East Sonora Street, Javier was walking east to west (see fn. 10), the direction he would have went had he come from the direction of Corona Liquors. The vehicle in which defendant and Gamboa were driving was traveling in the same direction.

Defendant concedes that both he and Gamboa wore white shirts when Javier was killed.[14]

Just before Javier R. was shot, A.R. heard someone say, " 'I told you I was going to kill you.' "  An obvious inference the jury could make from this is that the shooter previously, even recently, threatened to kill Javier R.  Such a threat would have been consistent with previous threats defendant had made earlier that day to other robbery victims.

Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the elements of the crime of attempted robbery of Javier R., the robbery-murder special circumstance, and the firearm enhancement beyond a reasonable doubt.  The evidence marshaled *ante* is sufficient for the jury to have concluded that defendant got out of the car Gamboa was driving at Corona Liquors and attempted to rob Javier R. in the parking lot; that Javier R. ran away in the direction of East Sonora Street; that defendant got into the car and Gamboa drove off in the same direction as Javier R. fled on foot; that approximately two minutes later, defendant, who at 16 years old looked like a "kid" and who was wearing the white shirt he was wearing when he robbed Martha and minutes later at Corona Liquors, got out of the car Gamboa was still driving as he had been driving when defendant robbed Martha earlier; that defendant, affronted, said to Javier R., who had thwarted defendant's robbery attempt in the Corona Liquors parking lot, " 'I told you I was going to kill you' "; that defendant then pulled out the same black semiautomatic handgun he had used in robbing

---

[14] Gilberto testified that the person who shot Luis, Gamboa, was wearing a white shirt. Victor in his 911 call said that the person who shot him, defendant, was wearing a white shirt.  Defendant, as seen on the video at Sufi Market showing his robbery of Martha less than 10 minutes before the incidents at Corona Liquors and the subsequent shooting of Javier R., was wearing a white shirt and dark pants.  Both the driver and passenger in the car depicted in the Corona Liquors video, People's exhibit 197, were wearing white shirts and dark pants.

Martha less than 10 minutes earlier; and aimed the gun and shot Javier R. in the back. This evidence, combined with the evidence establishing a pattern of robberies and the evidence establishing that the gun used to kill Javier R. was found in the backpack defendant was carrying and discarded when fleeing the police nine days later, was sufficient to establish both that defendant attempted to rob Javier R., and that defendant personally shot and killed Javier R. Contrary to defendant's contentions, this conclusion does not amount to speculation, but instead is based on the evidence and reasonable inferences to be drawn therefrom. Given the evidence and the reasonable inferences, this is not a case where " ' " " 'upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*Penunuri, supra*, 5 Cal.5th at p. 142, italics added.) Consequently, reversal for insufficient evidence is "unwarranted." (*Ibid*.)

## IV. Section 654

### A. Additional Background and Defendant's Contentions

Regarding the crimes committed against Luis, the trial court sentenced defendant to the following consecutive terms: life without the possibility of parole on count one, first degree murder, and 8 months on count 2, attempted robbery.

As for the crimes committed against Victor, the trial court sentenced defendant to the following consecutive terms: 7 years to life on count 6, attempted premeditated murder, plus 25 years to life for the firearms enhancement; 8 years on count 8, mayhem, plus 25 years to life for the firearm enhancement; and 8 months on count 7, attempted robbery, plus 25 years to life for the firearms enhancement.

Defendant asserts that the actions giving rise to his murder conviction (count 1), robbery-murder special circumstance, and attempted robbery conviction (count 2) involving Luis as the victim were all committed with one intent and objective—the robbery of Luis. He contends that, because the attempted robbery of Luis had no separate intent or objective from the murder (and the robbery-murder special circumstance), the sentence on that attempted robbery conviction must be stayed pursuant to section 654.

32

Defendant also asserts that the mayhem (count 8), attempted robbery (count 7), and attempted murder (count 6) convictions involving Victor were based on the same objective. Therefore, defendant asserts that the sentences imposed on the attempted robbery and mayhem convictions, and the sentences for the associated personal use of a firearm causing great bodily injury enhancement, must be stayed pursuant to section 654.

We agree as to count 8, mayhem, and the associated firearm enhancement, but reject defendant's other section 654 contentions.

## B. Section 654 Principles

Section 654, subdivision (a), provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 336.) "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

Where the trial court makes no express section 654 findings, we consider whether substantial evidence supports an implied finding of separate intent and objective. (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) An implied finding that there was more than one objective is a factual determination that must be sustained on appeal if it is supported

33

by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730.) And " '[w]e review the court's determination of [a defendant's] "separate intents" for sufficient evidence in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact the trier of fact could reasonably deduce from the evidence. [Citation.]' [Citation.]" (*People v. Andra* (2007) 156 Cal.App.4th 638, 640-641.)

### C.  Attempted Robbery and Murder of Luis Z.

The cases upon which defendant relies support the premise that, where the record contains no evidence to support a finding that the murder was committed with an intent separate from that required for an underlying felony, section 654 precludes punishment for both the murder and the underlying felony. (*People v. Hensley* (2014) 59 Cal.4th 788, 828 ( *Hensley*) ["The evidence does not suggest an intent or objective for the shooting other than to facilitate the robbery"]; *People v. Mulqueen* (1970) 9 Cal.App.3d 532, 547 ["It . . . is clear from the record here that there was but one act and that the act of robbery was the act which made the homicide first degree murder"].) And "[w]here a defendant is prosecuted *solely* on a theory of first degree felony murder, section 654 precludes punishment for both murder and the underlying felony. [Citation.] However, if the prosecution presents alternative theories—such as premeditation and felony murder—and there is evidence supporting a finding that the murder was premeditated, then the trial court may properly impose a sentence for both the murder and the felony." (*People v. Carter* (2019) 34 Cal.App.5th 831, 841.)

Here, the jury was presented with both premeditation and felony murder as alternative theories regarding count 1, and, contrary to defendant's contention in his reply brief, the prosecutor did make arguments addressed to premeditated murder with regard to Luis. Moreover, there was evidence supporting the theory of premeditation.

Alcauter testified that, earlier that day, defendant texted her to load his gun, which she did. Less than three hours prior to Gamboa's entry into the tire shop, his confederate,

defendant, shot Victor in the head in the commission of an attempted robbery, demonstrating the pair's plan to engage in such violence when met with perceived resistance or noncompliance. Gamboa entered the tire shop brandishing a gun and demanded money. Luis told Gamboa to hold on and reached to his pocket to get money. And yet, instead of waiting to accept the money Luis was apparently retrieving, Gamboa just shot him. Gamboa then left without taking any money or property. Gamboa's shooting of Luis was not in furtherance of or to facilitate a robbery; indeed, Gamboa's murder of Luis actually thwarted the robbery. By shooting Luis, Gamboa prevented Luis from handing over money. At some point, Gamboa told Alcauter that "he didn't want to give it up so [Gamboa] shot him."

The prosecutor argued that Alcauter's testimony demonstrated that the murder of Luis was premeditated: "It's more evidence that it wasn't just an accident, the gun didn't just go off. He didn't drop it. It wasn't accidental or negligent. . . . Gamboa shot [Luis] because he didn't give it up. That was a conscious choice. He didn't give it up fast enough, so he shot him. It means he's guilty of first-degree murder as felony murder *or as willful, premeditated, deliberate murder*." (Italics added.) The evidence supports the conclusion that Gamboa developed the separate intent to kill Luis and shot him as a deliberate and premeditated choice to punish him for not complying fast enough.

Thus, looking at the evidence in a light most favorable to the judgment, the evidence suggests an intent or objective for the shooting other than to facilitate the robbery. (Cf., *Hensley, supra*, 59 Cal.4th at p. 828 [evidence did not suggest an intent or objective for the shooting other than to facilitate the robbery].) Because there is substantial evidence that Gamboa had more than one objective when he committed the crimes against Luis – larceny and then punishment for perceived non-compliance – the trial court did not err by imposing a consecutive sentence on count 2.

35

## D. Attempted Robbery, Attempted Murder, and Mayhem Involving Victor D.R.

As with Luis's murder, the evidence supports the conclusion that defendant had an intent or objective for the shooting of Victor other than to facilitate a robbery. The trial evidence established defendant said to Victor, " 'Hey, let me see that phone.' " Victor turned around and noticed defendant was holding a gun close to Victor's face. Victor shook his head and continued to walk. Just when Victor looked over his shoulder to see if defendant was walking away, he heard a loud pop and felt something "really, really terrible."

Defendant shot Victor in the head, and the evidence supports the conclusion that the shooting was a gratuitous act of violence undertaken when Victor displayed the temerity to disregard defendant's demands. (See, e.g., *People v. Cleveland* (2001) 87 Cal.App.4th 263, 271-272 (*Cleveland*) [attempted murder can, under some circumstances, constitute the force necessary to commit a robbery, however, at some point the means to achieve an objective may become so extreme they can no longer be termed incidental; section 654 cannot be stretched to cover gratuitous violence far beyond that reasonably necessary to accomplish the original offense].) Indeed, after he shot Victor, defendant did not thereafter attempt to take the phone or any other property from Victor. Thus, the evidence supports the inference that after Victor shook his head to indicate he would not hand over his phone, defendant's objective of attempting to rob him ended (*People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1299-1300), and the shooting was for the purpose of avenging the failure to comply with defendant's demand. (*Id*. at pp. 1299-1300.) Accordingly, neither the mayhem nor the attempted murder can be viewed as merely incidental to the attempted robbery. (See *Cleveland*, at p. 272.) Because there is substantial evidence that defendant had different objectives when he attempted to rob Victor and then shot him in the head, the trial court did not err by imposing consecutive sentences on counts 6 and 7.

36

We reach a different result as to the sentences imposed on counts 6 (attempted murder) and 8 (mayhem).  Both convictions were based on defendant shooting Victor a single time in the head.  As the appellate court stated in the case on which defendant principally relies:  "We agree with defendant that under section 654, he may not be punished for both the attempted murder and mayhem counts. . . . The offenses were both based on the shooting of [the victim].  . . . [T]he three shots were fired within seconds of each other, and formed one transaction.  There was no evidence defendant had independent objectives for the two crimes that would justify multiple punishment.  In the circumstances, the sentence for the mayhem count should have been stayed." (*People v. Bui* (2011) 192 Cal.App.4th 1002, 1015, fn. omitted.)  The same holds true here.  As we have observed, the evidence supports the inference that defendant gratuitously shot Victor as an act of punishment for failing to comply with his demand.  Accordingly, execution of the sentences imposed on count 8 and the associated firearm use enhancement must be stayed pursuant to section 654.

## V.  Section 1202.4, Subdivision (*l*) Administrative Fee

### A.  Additional Background and the Parties' Contentions

The minute order memorializing sentencing and the abstract of judgment both reflect the imposition of a $1,000 administrative fee.  However, the trial court, in orally pronouncing sentence, did not orally impose this fee.  In his opening brief, defendant asserts that it is the court's oral pronouncement of sentence that controls and since the fee was not orally imposed, it must be struck.

The Attorney General asserts that the fee was authorized under section 1202.4, subdivision (*l*).  That section provides:  "At its discretion, the board of supervisors of a county may impose a fee to cover the actual administrative cost of collecting the restitution fine, not to exceed 10 percent of the amount ordered to be paid, to be added to the restitution fine and included in the order of the court."  The Attorney General asserts that, once the board of supervisors has exercised its discretion to impose the fee, the court

37

is statutorily obligated to impose it, and a trial court's failure to impose a mandatory fee would constitute an unauthorized sentence.

In reply, defendant asserts that, because he has been sentenced to state prison, the California Department of Corrections and Rehabilitation (CDCR) will collect restitution from him pursuant to section 2085.5,[15] and thus the county will incur no costs in doing so. According to defendant, because section 1202.4, subdivision (*l*), only authorizes the county to add a fee to the restitution fine "to cover the actual administrative cost of colleting the restitution fine," under these circumstances, the statute does not authorize the administrative fee, and allowing the fee to stand would unfairly double the fee because CDCR will add its own administrative fee. Thus, defendant maintains that the administrative fee is unauthorized. We disagree.

### B. Analysis

In a case involving a state prison sentence, this court held that the trial court did not err by imposing 10 percent administrative fee in section 1202.4 subdivision (*l*). (*People v. Robertson* (2009) 174 Cal.App.4th 206, 211.) The panel did not elaborate on why the fee must be imposed on a person sentenced to state prison. In responding to defendant's contention here, we explain why.

First, defendant's position is based on the erroneous assumption that every state prisoner will have a prison job with wages or a prisoner trust account from which a

---

[15] At the time of the charged offenses, section 2085.5, subdivision (a), provided, in pertinent part: "In any case in which a prisoner owes a restitution fine imposed pursuant to . . . subdivision (b) of Section 1202.4, the Secretary of the Department of Corrections and Rehabilitation shall deduct a minimum of 20 percent or the balance owing on the fine amount, whichever is less, up to a maximum of 50 percent *from the wages and trust account deposits* of a prisoner, unless prohibited by federal law, and shall transfer that amount to the California Victim Compensation and Government Claims Board for deposit in the Restitution Fund in the State Treasury. The amount deducted shall be credited against the amount owing on the fine." (§ 2085.5, former subd. (a), italics added.)

restitution fine can be deducted pursuant to section 2085.5. This is not necessarily the case. For example, a prisoner's misbehavior may render him or her ineligible for a prison job and funds might not be deposited into a trust account. The county may have to collect the fine from other sources, incurring expenses as a result.

Second, even if a defendant does obtain a prison job or deposits money into a trust account, the county is not barred from attempting to collect the fine from other sources just because some contribution to the payment of the fine might be made from prison earnings or the trust account.

Third, nothing in the statutory scheme can be interpreted to preclude a trial court from imposing the 10 percent administrative fee pursuant to section 1202.4, subdivision (*l*), when a defendant is sentenced to state prison. Nor is there anything in the statutory scheme that even remotely suggests the administrative fees imposed by the CDCR pursuant to section 2085.5, subdivision (a), and the county pursuant to section 1202.4, subdivision (*l*), are mutually exclusive, or that the county will necessarily be uninvolved in collecting defendant's restitution fine because he has been sentenced to prison. To the contrary, the plain language of section 1202.4, subdivision (*l*) requires that the fee "be added to the restitution fine and included in the order of the court." We apply the plain language when interpreting this statute. (*People v. Lucero* (2019) 41 Cal.App.5th 370, 394-395, quoting *People v. Arias* (2008) 45 Cal.4th 169, 177 ["The statute's plain meaning controls the court's interpretation unless its words are ambiguous"].) We will not read a prison sentence exception into the statute's requirement. (*Sustainability, Parks, Recycling & Wildlife Defense Fund v. Department of Resources Recycling & Recovery* (2019) 34 Cal.App.5th 676, 702 [" 'we should not read statutes to omit expressed language or include omitted language' "].)

Fourth, defendant's argument overlooks the fact that, if a county board of supervisors has elected to impose an administrative fee to offset the costs of collecting a restitution fine pursuant to section 1202.4, subdivision (*l*), that section provides that the

fee is to be attached to the defendant's restitution fine at the time of sentencing.[16] This necessarily precedes the county incurring any collection costs as to that particular defendant's fine. The statute does not require proof that the county will incur collection costs before the fee is imposed. Thus, the statute is not focused on a defendant's actual circumstances relative to how restitution is collected or the actual amount a county may ultimately incur in collecting that fine after imposition of the fee.

A trial court's failure to add a mandatory administrative fee results in an unauthorized sentence subject to correction on appeal. (See *People v. Talibdeen* (2002) 27 Cal.4th 1151, 1157.) "[O]bvious legal errors at sentencing that are correctable without referring to factual findings in the record or remanding for further findings are not waivable." (*People v. Smith* (2001) 24 Cal.4th 849, 852 [imposition of a parole revocation fine that was less than the imposed restitution fine could be corrected on appeal even though no objection at sentencing].) Accordingly, we shall modify the oral imposition of sentence to reflect the imposition of this $1,000 collection fee pursuant to section 1202.4, subdivision (*l*).

## VI. Parole Revocation Fine

The trial court imposed a $10,000 parole revocation fine pursuant to section 1202.45, which the court ordered suspended unless parole was revoked. Section 1202.45, subdivision (a), provides: "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b)

---

[16] Defendant does not assert that San Joaquin County's Board of Supervisors has not imposed an administrative fee of 10 percent to cover its administrative cost of collecting restitution fines pursuant to section 1202.4, subdivision (*l*) and there is no indication that the county has not done so.

40

of Section 1202.4." This fine "shall be suspended unless the person's parole . . . is revoked." (§ 1202.45, subd. (c).)

Defendant asserts that, given the nature of the sentence imposed, there is no parole eligibility and thus the trial court's imposition of a parole revocation fine pursuant to section 1202.45 was unlawful and should be struck. The Attorney General agrees that the parole revocation fine should be struck in light of defendant's LWOP sentence. We disagree and do not accept the Attorney General's concession.

"A parole revocation fine may not be imposed for a term of life in prison without possibility of parole, as the statute is expressly inapplicable where there is no period of parole." (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819 (*Jenkins*).) However, in addition to his LWOP sentences, defendant also received multiple unstayed determinate prison terms. All such determinate terms "shall include a period of parole" under section 3000, subdivision (a)(1). (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075 (*Brasure*).) The court in *Brasure* upheld imposition of a section 1202.45 parole revocation fine where the defendant was sentenced to death *and* to determine prison terms under section 1170. (*Brasure*, at p. 1075.) Under *Brasure*'s interpretation of the relevant Penal Code provisions, the trial court properly imposed a parole revocation fine here.

Defendant relies on *Jenkins, supra*, 140 Cal.App.4th 805, and *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, for the proposition that a parole revocation fine may not be imposed for an LWOP term because section 1202.45 is expressly inapplicable where there is no period of parole. However, defendant does not acknowledge our high court's more recent decision in *Brasure*. The rationale in *Brasure* applies here, where the trial court imposed numerous determinate terms. Moreover, we note that defendant "is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked." (*Brasure, supra*, 42 Cal.4th at p. 1075.)

41

**DISPOSITION**

The judgment is modified (1) to stay execution of the sentences imposed on count 8 and the associated firearm use enhancement pursuant to section 654, and (2) impose a $1,000 collection fee pursuant to section 1202.4, subdivision (*l*) not stated in the oral imposition of sentence. As so modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment indicating the section 654 stay on count 8 and the associated firearm use enhancement and forward a certified copy of the abstract to the Department of Corrections and Rehabilitation.

_____/s/_____
MURRAY, J.

We concur:

_____/s/_____
BLEASE, Acting P. J.

_____/s/_____
ROBIE, J.